UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH MERLONE,

                     Plaintiff,              Civil Action No. 15-12882
                                          Honorable John Corbett O'Meara
                                          Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                     Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [20, 25]

       Plaintiff Joseph E. Merlone ("Merlone") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [20, 25], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.      RECOMMENDATION

       For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Merlone is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [25] be GRANTED, Merlone's Motion for Summary Judgment [20] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On January 3, 2013, Merlone filed an application for DIB, alleging a disability onset date of November 22, 2012.  (Tr. 125, 153).  This application was denied at the initial level.  (Tr. 81-84).  Merlone filed a timely request for an administrative hearing, which was held on July 17, 2014, before ALJ Manh H. Nguyen.  (Tr. 48-70).  Merlone, who was represented by attorney John Wildeboer, testified at the hearing, as did vocational expert Donald Hecker.  (*Id.*).  On October 14, 2014, the ALJ issued a written decision finding that Merlone is not disabled under the Act.  (Tr. 31-42).  On June 15, 2015, the Appeals Council denied review.  (Tr. 1-5).  Merlone timely filed for judicial review of the final decision on August 14, 2015.  (Doc. #1).  On February 16, 2016, Merlone filed a Motion for Summary Judgment.  (Doc. #20).  The Commissioner filed a Motion for Summary Judgment on July 22, 2016 (Doc. #25), and Merlone filed a reply on August 8, 2016.  (Doc. #26).

B.    **Framework for Disability Determinations**

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits … physical or

2

mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    *Merlone's Reports and Testimony*

At the time of the administrative hearing, Merlone was 52 years old, and at 5'7'' tall, weighed 185 pounds. (Tr. 54). He lived in a house with his wife and seven-year-old twin daughters. (Tr. 54-55, 168). Merlone's highest level of education is twelfth grade. (Tr. 54). He worked as a truck driver for a flower company from May 5, 1991 until November 22, 2012, the alleged onset date. (Tr. 55-57, 158). He tried going back to work in early 2013 but was sent home after a few hours because his employer "said [he] was late and … [he] was making them nervous when [he] was there …. And [he] didn't feel good." (Tr. 56). According to Merlone, he felt like he had motion sickness; he was nauseous, dizzy, short of breath, and felt like he had to

3

vomit.  (Tr. 57-58).  He had "no idea" what caused him to feel this way.  (Tr. 56).  On that day in

2013 when Merlone was sent home from work, he was not moving around and was not driving a

truck; he was sitting at a desk answering phones.  (Tr. 58).

Merlone alleges disability as a result of various physical conditions, including a heart

condition, high blood pressure, blood in his urine, coronary artery disease, aortic aneurysm, a

mass on his bladder (which at the time, was being evaluated for cancer), and diabetes.  (Tr. 157).

He testified that when he tried going back to work in 2013, he "didn't feel good all day."  (Tr.

59).  He added, "I never really do feel good."  (*Id.*).  Regarding the motion sickness he described

above, Merlone further testified that "I have those symptoms every day," and "[s]ome days they

are worse, [but] they are never better."  (*Id.*).  He testified that, in addition to motion sickness, he

is starting to have chest pains again regularly, he has diarrhea daily, and has difficulty walking or

standing due to numbness and tingling.  (Tr. 62-64).  In particular, if he is standing for more than

three minutes, his feet "hurt terribly" and his legs get "all numb and cramped up, and it … limits

[his] ability to walk."  (Tr. 64).  Merlone testified that he has difficulty concentrating and

assumed it is because of the combination of his different symptoms.[1]  (Tr. 64-65).

Merlone also testified that he had a catheterization and stents implanted three times—the

first time was in November 2012—but his symptoms did not change substantially after these

procedures.  (Tr. 60).  One month before the administrative hearing, Merlone went to the

emergency room.  He said his symptoms included a severe headache, dizziness, and "just all

flutter feeling."  (Tr. 60-61).  Merlone testified that, at the hospital, they determined his blood

pressure was too high.  (Tr. 61).  They brought down his blood pressure and, given the number of

---

[1] As the ALJ noted (Tr. 37), during the administrative hearing held on July 17, 2014, Merlone testified that he has difficulty concentrating.  (Tr. 64-65).  But when Merlone filled out his Disability Report on February 4, 2013, he said he can pay attention for a long time.  (Tr. 173).

medications he was taking, had him see his cardiologist the next day.  (Tr. 61).  His cardiologist prescribed another blood pressure medication.  (*Id.*).  After this trip to the emergency room, Merlone saw Dr. Baker, an ear, nose, and throat doctor.  (Tr. 63).  Dr. Baker tested Merlone for allergies (and found that Merlone has some), but when he tested Merlone for vertigo, Merlone "never finished the actual test for it, because [he] became violently ill."  (Tr. 63).

Merlone takes several medications for his heart, including Amlodipine/Benazepril, Atorvastatin, Coreg, Ecotrin, Imdur, Spironolactone-Hydrochlorothiazide (Spirono HCTZ).  (Tr. 159).  These medications do not cause side effects.  (Tr. 175).

Merlone testified that on an average day, he wakes up "slowly" and takes his medicine. (Tr. 59, 169).  He checks his blood pressure, and after that, he is sick and there isn't much he can do.  (*Id.*).  By nine o'clock in the morning, he is usually sleeping again.  (Tr. 59).  He further testified that he sleeps all night[2] and then sleeps "on and off" throughout the day, "depending on how [he] feel[s]," asserting that he "just doesn't have any energy and no ambition to do anything all day."  (*Id.*).  Overall, Merlone said he cannot function on a daily basis "without passing out" and says his "vision is real poor" because of his medical issues.  (Tr. 168).  When asked what he was able to do before his illnesses or conditions that he can't do now, Merlone responded: "function.  [T]he main problem."  (Tr. 169).

According to Merlone, he doesn't really do anything for his young twin daughters.  (Tr. 55).  He testified that he tries to watch them, but he "can't get very far at it."  (*Id.*).  His older children try to help him with this.  (Tr. 169).  Merlone doesn't help his daughters with their homework because "[t]hey don't really have a lot of homework right now."  (*Id.*).  He doesn't do

---

[2] During the administrative hearing held on July 17, 2014, Merlone testified that he sleeps all night.  (Tr. 59).  When Merlone filled out his Disability Report on February 4, 2013, however, he checked a box indicating that his illnesses or conditions affect his sleep.  (Tr. 169).  Although asked to elaborate, he did not explain how they affect his sleep.  (*Id.*).

yard work or house work because his "condition" does not allow him to without "getting real sick." (Tr. 60, 171). Merlone explained that his difficulty with doing laundry is that he can't do the required work of carrying it outside and hanging it on a line. (Tr. 60). He might cook weekly, but for the most part, his wife takes care of preparing meals for the family. (Tr. 170). He doesn't shop because other people do this for him, too. (Tr. 171).

Merlone indicated having no problems with personal care; he is able to bathe, dress himself, fix his hair, shave, feed himself, and use the toilet. (Tr. 169). Along those lines, he doesn't need to be reminded to carry out his personal needs. (Tr. 170). At the same time, he said he "can't" go outside alone because he is "scared of his illness" and what could happen if he were alone. (Tr. 171). He doesn't drive because of his vision problems and because "it is very dangerous, with what can come on real quick to make me faint behind the wheel." (*Id.*). However, Merlone is able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*). As for hobbies, he now watches television; he can no longer hunt or fish. (Tr. 172). Although he is able to socialize and does not have problems interacting with others, he does not spend time with others and does not "go anywhere"—especially after he stopped working. (Tr. 173). He is able to follow spoken and written instructions well, but written instructions are sometimes difficult because he "can't read most of the time." (*Id.*).

Merlone does not use a walking aid. (Tr. 174). Still, he estimated that he can walk only 100 yards before needing to stop, and he would need to rest for thirty minutes before he can resume walking. (Tr. 173). His illnesses or conditions affect his ability to lift, squat, bend, stand, reach, walk, kneel, stair climb, see, and complete tasks because he feels lightheaded and dizzy and turns white. (*Id.*). He experiences a line in the center of his vision, which he can't see around and which lasts up to eight hours. (*Id.*).

6

2.      *Medical Evidence*

The Court has thoroughly reviewed Merlone's medical record.  In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

3.      *Vocational Expert's Testimony*

Donald Hecker testified as an independent vocational expert ("VE") at the administrative hearing.  (Tr. 65-69).  The VE submitted a worksheet showing Merlone's past relevant work to be a truck driver or salesman.  (Tr. 66).  The ALJ adopted this description.  (*Id.*).  The ALJ asked the VE to imagine a hypothetical individual of Merlone's age, education, and work experience that could occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk up to four hours in an eight-hour workday; sit for up to six hours in an eight-hour workday; occasionally operate foot controls; cannot climb ladders, ropes, or scaffolds; cannot kneel or crawl; can occasionally climb some stairs and ramps, balance, stoop, and crouch; and cannot work at unprotected heights or unguarded, moving machinery.  (*Id.*).  The VE testified that the hypothetical individual would not be capable of performing Merlone's past work.  (*Id.*). However, the VE further testified that the hypothetical individual would be capable of working in the following light, unskilled jobs:   cleaner (240,000 jobs), packer (140,000 jobs), and checker/inspector (160,000 jobs).  (Tr. 66-67).  After providing this list, the VE added that "[t]here'd be other jobs, these are just examples."  (Tr. 67).  The VE asserted that his testimony is consistent with the Dictionary of Occupational Titles ("DOT").  (Tr. 68).

The ALJ then asked the VE to imagine the hypothetical individual described above, but who could only do simple tasks (instead of unskilled tasks).  (Tr. 68).  The VE testified that this would not change his answer regarding the hypothetical individual's capabilities and that this

answer is consistent with the DOT. (*Id.*).

The ALJ then asked the VE to imagine this second hypothetical individual (limited to simple tasks), but who would be off-task twenty percent of the workday due to inattention, distraction, and lack of focus; and who would miss three days of work a month. (*Id.*). The VE testified that there would be no jobs in significant numbers in the national economy for a person with these two additional restrictions. (*Id.*). The VE further testified that each one of these, individually, "would be disabling." (Tr. 69). This opinion was based on the VE's experience because the DOT "does not address this particular issue." (*Id.*).

### D.      The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Merlone has not engaged in substantial gainful activity since November 22, 2012 (his alleged onset date). (Tr. 33). At Step Two, the ALJ found that Merlone has the severe impairments of coronary artery disease (status post-triple bypass surgery), hypertension, hyperlipidemia, hematuria, obesity, diabetes mellitus, diabetic neuropathy, and stage I bladder cancer. (Tr. 34). At Step Three, the ALJ found that Merlone's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 35).

The ALJ then found that Merlone retains the residual functional capacity ("RFC") to perform light work with the following additional limitations: occasionally lifting twenty pounds; frequently lifting ten pounds; standing and/or walking up to four hours in an eight-hour workday; sitting for up to six hours in an eight hour workday; occasionally operating foot controls, climbing stairs/ramps, balancing, stooping, and crouching; no climbing ladders, ropes, or scaffolds; no kneeling or crawling; no working around unprotected heights or uncovered, unguarded moving machinery. (Tr. 36).

At Step Four, the ALJ concluded, based in part on the VE's testimony, that Merlone is unable to perform his past relevant work as a delivery truck driver. (Tr. 40). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Merlone is capable of performing a significant number of jobs that exist in the national economy. (Tr. 41). As a result, the ALJ concluded that Merlone is not disabled under the Act. (Tr. 42).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

## F.    Analysis

In his motion for summary judgment, Merlone argues that: (1) the ALJ erred by failing to give significant weight to treating physician Dr. Rodney Diehl's opinion, by giving limited weight to Nurse Practitioner Barbara VanderHeide's opinion, and by failing to evaluate their opinions pursuant to 20 C.F.R. §404.1527(c); (2) the ALJ erred by determining a RFC that failed to address the combined effects of all of Merlone's conditions and the resulting absences from work necessitated by his medical care, which would have prevented him from engaging in

10

substantial gainful activity on a persistent basis; and (3) the ALJ erred in evaluating Merlone's

credibility regarding the severity of his symptoms.[3]  Each of these arguments is addressed below.

>    1.    *Substantial Evidence Supports the ALJ's Decision to Give*
>          *Limited Weight to Dr. Diehl and Nurse Practitioner*
>          *VanderHeide's Opinions*

Merlone argues that the ALJ erred in "failing to give significant weight" to the August

2013 opinion of his "treating physician," Dr. Diehl.  (Doc. #20 at 10-13).  Merlone also argues

that the ALJ erred in giving Nurse Practitioner VanderHeide's June 2013 opinion "limited

weight" because her testimony also should have been accorded the weight of a "treating

physician."[4]  (Doc. #20 at 14-17).  Pursuant to 20 C.F.R. §404.1513(a), acceptable medical

sources to establish whether a claimant has a medically determinable impairment include:

licensed physicians (medical or osteopathic doctors); licensed or certified psychologists; licensed

---

[3] Merlone also argues that the ALJ's purported "findings" that he (1) engaged in substantial gainful activity after his alleged onset date and (2) failed to properly disclose his 2013 work activity "are not supported by substantial evidence of record and are contrary to the evidence." (Doc. #20 at 6).  As to the former, the Commissioner correctly notes that any error "was, at most, harmless, because the ALJ actually found in [Merlone's] favor [at Step One,] and continued the sequential evaluation."  (Doc. #25 at 7-8 n.5; Tr. 33 (finding that Merlone "has not engaged in substantial gainful activity since November 22, 2012, the alleged onset date.")).  Moreover, contrary to Merlone's argument that "the [ALJ's] finding that [he] had engaged in substantial gainful activity in 2013 had the effect of reducing [his] credibility when he testified that he was unable to perform any work of any nature since November 2012" and that the ALJ failed to consider his "lengthy employment record and his return to work for several years after his triple bypass surgery," (Doc. #20 at 10, 23), the ALJ expressly considered whether Merlone's work efforts in 2013 constituted an "unsuccessful work attempt."  (Tr. 34).  Not only did the ALJ answer that question in the affirmative, but he also found that Merlone stopped working "due to his impairments."  (*Id.*).  While this finding does not necessarily dictate a finding of disability, it does show that the ALJ did not hold Merlone's work attempt against him.  (*Id.*) (finding that Merlone's unsuccessful work attempt "does not preclude a finding of disability.")  The Court will address Merlone's alleged failure to disclose the work attempt in its discussion of the ALJ's credibility analysis.  *See infra* at 26.

[4] The Commissioner argues that Dr. Diehl's and Nurse Practitioner VanderHeide's treatment notes were not "opinions" subject to the treating source regulation.  (Doc. #25 at 13-14, 18). Though the Court finds some merit to this argument—as the "opinions" at issue are merely a few sentences contained in a treatment note—it is a moot issue, because Merlone's substantive argument lacks merit.

optometrists; licensed podiatrists; and qualified speech-language pathologists.   Only these "acceptable medical sources" can be treating sources under the "treating physician" rule.   *Soc. Sec. Rul. 06-03p*, 2006 WL 2329939, at \*2 (Aug. 9, 2006).   In addition to "acceptable medical sources," evidence from "other sources" (as defined in 20 C.F.R. §§404.1513(d), 416.913(d)) can be used to show the severity of an individual's impairment and how it affects the individual's ability to function.   (*Id.*).   But unlike "acceptable medical sources," evidence from "other sources" cannot establish that a medically determinable impairment exists.   (*Id.*).   A nurse practitioner is considered an "other source."   (*Id.*).

A treating physician is an acceptable medical source who provides, or has provided, medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the patient.   20 C.F.R. §416.902; *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at \*8 (6th Cir. Nov. 15, 2000) (citing 20 C.F.R. §404.1527) ("[D]espite the fact that Dr. Reina examined Boucher on three occasions, Dr. Reina did not have an ongoing treatment relationship with him and was therefore not a treating source."); *Wells v. Comm'r of Soc. Sec.*, No. 1:08-CV-148, 2009 WL 648603, at \*5 (S.D. Ohio Mar. 10, 2009) ("Dr. Koppenhoefer is not a 'treating' physician; he saw Wells once for a consultation regarding his SSA application.").   Generally, an ongoing treatment relationship exists when the medical evidence establishes that the patient sees, or has seen, the source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition."   20 C.F.R. §416.902.   As a result, a physician who sees a patient only a few times or only after long intervals may be a treating source only if the nature and frequency of the treatment or evaluation is typical for the particular condition.   (*Id.*).   "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time

12

will have a deeper insight into the [claimant's] medical condition" as compared to a medical professional "who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994) (finding that "the brevity of the treatment relationship with [the claimant] supports the ALJ's decision to discount [the physician's] opinion").

Courts have recognized that an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."). If the ALJ declines to give a treating physician's opinion controlling weight, she must document how much weight she gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. §404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion)).

On August 2, 2013, Dr. Diehl noted that Merlone's "life style has markedly changed and he is not able to work consistently." (Tr. 738). Prior to that, on June 3, 2013, Nurse Practitioner

VanderHeide noted that Merlone was being evaluated for certain issues, with follow up pending, so "[h]e should avoid strenuous work and activities that aggravate [his] symptoms." (Tr. 451). She added that Merlone "needs to rest until follow up with surgeon and cardiologist are accomplished and further instructions regarding physical activities." (*Id.*). The ALJ explicitly considered Dr. Diehl's and Nurse Practitioner VanderHeide's statements and concluded that they conflicted with the findings of state agency physician Dr. Robert Nelson, M.D., whose opinion the ALJ found "to be the most consistent with the evidence cited throughout [his] decision." (Tr. 39). As a result, the ALJ "gave [Dr. Nelson's opinion] greater weight than the others." (*Id.*).

The Court finds that Dr. Diehl and Nurse Practitioner VanderHeide are not treating physicians for purposes of the treating physician rule. As the Commissioner points out, Dr. Diehl saw Merlone only twice (Doc #25 at 12): once on November 21, 2012 (Tr. 323) and a second time on August 2, 2013. (Tr. 736). Dr. Diehl is a cardiologist, yet Merlone also saw other physicians for his heart-related conditions in between his two appointments with Dr. Diehl. In fact, on April 10, 2013, a note by Dr. Rahul Velaga says that Merlone's "previous cardiologist was Dr. Lauer, but [Merlone] is not following with anybody at this point, so we will consult whoever is on call." (Tr. 458-59). Dr. Lauer performed Merlone's stent procedure on November 24, 2012 (Tr. 376, 633) and consulted with Ashley Daily, ANP-C, when she saw Merlone on December 3, 2012 (Tr. 320) and on February 1, 2013. (Tr. 314). Furthermore, a note dated June 6, 2013, electronically authenticated by Dr. Robert N. Jones, says Merlone was encouraged to follow up with cardiologist Dr. Lauer—not Dr. Diehl—regarding his symptoms. (Tr. 734). In addition, that Merlone was seeing Dr. Lauer for his heart condition makes it so that Merlone cannot argue that his particular condition only required two visits with Dr. Diehl. Given these

facts in the record, the ALJ did not err in declining to give controlling weight to Dr. Diehl's opinion under the treating physician rule.

As a nurse practitioner, VanderHeide is not an acceptable medical source (Tr. 39) and, therefore, she is not a "treating physician." *Soc. Sec. Rul. 06-03p*, 2006 WL 2329939, at *2 (Aug. 9, 2006). Merlone argues that nurse practitioners are increasingly performing the treatment and evaluation functions previously handled primarily by physicians, so their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." (*Id.*). Even if Merlone's argument was facially sensible, it gets him nowhere here because the ALJ did exactly what Merlone contends he should have done; he explicitly considered Nurse Practitioner VanderHeide's opinion regarding Merlone's ability to function. (Tr. 39). But given the record evidence, the ALJ appropriately determined that opinion was entitled to only limited weight. (*Id.*). As an "other source" provider, and not a treating physician, the ALJ was not required to adopt her opinion or give it significant weight. The ALJ also appropriately noted that Nurse Practitioner VanderHeide's suggestions were temporary: she recommended Merlone avoid strenuous work and rest—not permanently—but only until he followed up with his surgeon and cardiologist and received further instructions regarding physical activities. (Tr. 39 (noting that VanderHeide imposed restrictions of "short duration"), 447).

Merlone incorrectly assumes that the treating physician doctrine applies to Dr. Diehl's and Nurse Practitioner VanderHeide's opinions, and so he incorrectly argues that the ALJ should have given "specific reasons for the weight given to the treating sources [sic] opinion based on the factors designated in 20 C.F.R. [§]404.1527(d)(2) and must be sufficiently specific to make clear the reason for the weight given to the opinion." (Doc. #20 at 11-12). Since Dr. Diehl and

15

5:15-cv-12882-JCO-DRG   Doc # 28   Filed 08/16/16   Pg 16 of 31   Pg ID 1061

Nurse Practitioner VanderHeide are not treating physicians, this requirement for the ALJ to provide specific reasons for giving their opinions less weight does not apply. Although not required to do so, in his decision, the ALJ did explain why he gave "limited weight" to Dr. Diehl's and Nurse Practitioner VanderHeide's opinions. These reasons were in addition to them being less consistent with the medical evidence in the record than Dr. Nelson's opinion. As for Dr. Diehl, the ALJ appropriately found his opinion was "not specific in defining [Merlone's limitations and appeared to rely quite heavily on [Merlone's] subjective complaints." (Tr. 39). Meanwhile, the ALJ found that Nurse Practitioner VanderHeide, who is "not an acceptable medical source," authored notes that contained "a lack of specificity regarding what activities were aggravating," and the "short duration of those restrictions did not consider the general improvements in the claimant's conditions that occurred afterward." (*Id.*). Because Dr. Diehl and Nurse Practitioner VanderHeide are not treating physicians, the ALJ provided more of an explanation than was necessary in deciding to give their opinions limited weight.

When state agency physician Dr. Nelson reviewed Merlone's records in March 2013, he recognized that Merlone has "limitations in [his] ability to perform work-related activities." (Tr. 78). But he determined that Merlone's "condition is not severe enough to keep [him] from working"—if not his past relevant work, then Merlone "can adjust to other work." (*Id.*). This conclusion is consistent with the VE's testimony that a hypothetical individual with Merlone's age, education, work experience, and limitations could perform other light, unskilled occupations, such as a cleaner, packer, or checker/inspector. (Tr. 66-67). It is also consistent with substantial evidence in the record. Other than Dr. Diehl and Nurse VanderHeide, Merlone's medical providers did not impose any physical restrictions on him. Even in November 2014, upon being discharged from the hospital after having a tumor in his bladder removed, Merlone's

16

activity level was "ad lib," or as desired.  (Tr. 712).  On various occasions, his gait and station were "normal."  (Tr. 316, 319, 321, 440, 450, 738).  His mood and affect were also "normal." (Tr. 316, 319, 734, 738).  And his general appearance was well-developed, well-nourished, and "in no acute distress."  (Tr. 314, 688, 736, 777, 809, 814).  "Opinions of one-time examining physicians and record-reviewing physicians … are also weighed under the same factors as the treating physician."  *Valentine v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 639, 653 (S.D. Ohio 2012) (citing 20 C.F.R. §§404.1527(d), (f)).  Thus, because Dr. Nelson's findings are backed by substantial evidence in the record, it was appropriate for the ALJ to give his opinion greater weight.

In sum, the Court concludes that the ALJ's consideration of the opinions of Dr. Diehl and Nurse Practitioner VanderHeide is consistent with the applicable regulations and supported by substantial evidence.  Even if their opinions had been subject to the treating physician rule, the ALJ appropriately explained, for all of the reasons stated above, why he would not give them controlling or even significant weight.  (Tr. 39).

### 2.   Substantial Evidence Supports the ALJ's RFC Determination

Merlone argues that the ALJ erred in determining a RFC that failed to address the combined effects of all of his conditions and resulting absences from work necessitated by Merlone's medical care, which would have prevented him from engaging in substantial gainful activity on a consistent basis.  (Doc. #20 at 17-22).  Merlone calculates that since November 2012, he has been hospitalized for seventeen days.  (*Id.* at 19).  In addition, Merlone lists medical appointments, tests, and procedures that total approximately thirty-two days that "would have made [him] unavailable for work."[5]  (*Id.* at 20-22).

---

[5] Importantly, an individual can attend numerous medical appointments, tests, and procedures and still hold a job.  There is no evidence that Merlone's appointments lasted all day or that these

Courts have recognized that an ALJ's failure to consider the effect of numerous hospitalizations on a claimant's ability to work can constitute reversible error. In a decision issued just last month, the undersigned found that the ALJ failed to properly consider the fact that the plaintiff had spent all or part of thirty-nine days in the hospital during a sixteen-month period of time, for an average of 2.4 days per month.[6] *See Minke v. Comm'r of Soc. Sec.*, Case No. 15-cv-12516, Dkt. #17 at 9-15 (unpublished), Report and Recommendation adopted by 2016 WL 4205992 (E.D. Mich. Aug. 10, 2016). Similarly, in *O'Mahony v. Colvin*, 2015 WL 3505211, at *3 (M.D.N.C. June 3, 2015), the plaintiff argued that the ALJ erred "by not considering and explaining the effect of [his] recent history of frequent hospitalizations on his ability to obtain and sustain employment." In that case, the plaintiff spent approximately twenty-five days hospitalized during a ten-month period, which the vocational expert testified "would not allow for competitive employment." (*Id.*). The *O'Mahony* court found that the ALJ erred in failing to analyze the effect of the plaintiff's history of frequent hospitalizations on his ability to obtain employment and remanded the case for further consideration of that issue. (*Id.* at *4).

Likewise, in *Hawke-Dingman v. Comm'r of Soc. Sec.*, 2012 WL 5328674 (E.D. Mich. Sept. 11, 2012), the court remanded the case pursuant to sentence six of 42 U.S.C. §402(g) when presented with evidence of several hospitalizations after the administrative hearing. In that case, the court recognized that the new evidence—when viewed in light of evidence previously

---

procedures required a long preparation or recovery period. Thus, the Court cannot conclude that Merlone would have been unavailable for a full thirty-two days in the same way he was unavailable during his inpatient hospitalizations. Further, if he had been working during this time frame, he might have made an effort to schedule these appointments, tests, and procedures at times that would have conflicted less with his employment, for instance, one after another, or early in the morning, in the evening, and on weekends.

[6] The VE in that case had specifically testified that a claimant who missed two or more days of work per month would be precluded from all competitive work. (*Id.*).

presented—might establish that the plaintiff was unable to work on a regular and continuing basis. Specifically, the court observed:

> Between November 2009 and October 2010, Plaintiff was hospitalized for 44 days. She has now produced evidence that she was hospitalized for 14 days in 2011, and, so far in 2012, 11 days. It is far from plain that a person requiring hospitalization as frequently as Plaintiff—69 days in less than three years (about two days per month)—would be able to maintain substantial gainful employment. In fact, the VE testified that missing more than two days of work per month would likely preclude full-time employment.

(*Id.* at *12) (internal citations omitted). But unlike in *Minke*, where the plaintiff was hospitalized an average of 2.4 days per month over a year and half, and *O'Mahony*, where the plaintiff spent twenty-five days hospitalized in ten months (2.5 days per month), here, Merlone was hospitalized for seventeen days in eighteen months (less than one day per month). And unlike in *Hawke-Dingman*, where the plaintiff was hospitalized for even longer, no additional evidence of any recent or additional significant hospitalizations is in the record.

Equally, if not more importantly to the ALJ's analysis, are the details of Merlone's hospitalizations. In *Bryce v. Comm'r of Soc. Sec.*, 2014 WL 1328277, at *3 (E.D. Mich. Mar. 28, 2014), the ALJ specifically considered the details of the plaintiff's hospitalizations, finding that they were not for extended durations (he improved within approximately one week or less), that his condition improved through the course of each hospitalization, and that his treatment was effective when he was compliant with it. The court found that because the plaintiff's psychological and psychiatric impairments could be controlled with medication and treatment, this "undercut[] the claimed severity of his conditions," (*Id.* at *5) (citing *Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 754 (6th Cir. 2012)), particularly because during "the brief, acute periods of illness documented by the hospitalizations in the record, Plaintiff responded quickly and well to therapy and medication." (*Id.*) (citing *Headen v. Astrue*, No. 10-648, 2011 WL

19

3566796, at *8 (S.D. Ohio July 22, 2011)).  Thus, impairments that are controlled by medication are not disabling, even if periods of illness are linked to the failure to take these medications. (*Id.*).  The court also found that evidence of periods of improvement in the plaintiff's condition supported the ALJ's conclusion that periodic hospitalizations did not indicate a disabled status. (*Id.* at *7).

Similarly, as for hospitalizations due to physical impairments, in *Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990), the Sixth Circuit concluded that "in evaluating multiple sclerosis, or any other episodic disease, consideration should be given to the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities."  In *Wilcox*, the court characterized multiple sclerosis as "an incurable, progressive disease subject to periods of remission and exacerbation."  (*Id.*) (internal citation omitted).

Here, the ALJ thoroughly and properly considered the evidence related to Merlone's hospitalizations.  (Tr. 37-39).  Merlone was hospitalized six times between November 2012 and May 2014.  (*Id.*).  In each case, it was for a short duration (less than one week), his condition improved during each hospitalization, and his medications and treatment were effective when he complied with them.  On November 20, 2012, Merlone was admitted to the hospital with chest pains and hypertension.  (Tr. 230).  One record indicates his blood pressure was at 187/98 (*Id.*), and another indicates it was at 230/133.  (Tr. 266, 401).  Physicians at the hospital noted that Merlone was a known hypertensive[7] who had stopped taking his blood pressure medications for about a year because of financial reasons, and because according to Merlone, the medications had not been working.  (Tr. 230, 233, 252, 266, 269, 270, 317, 402, 611, 612, 614, 617).  While

---

[7] On November 22, 2012, Merlone told Dr. Adeel Khan he had a history of hypertension "for many years."  (Tr. 401).

in the hospital, Merlone underwent a left heart catheterization (Tr. 231, 633), had a bare metal stent placed "successful[ly]" (Tr. 231, 376), and was put on a nitroglycerin drip and medications such as Vasotec, Hytrin, hydrochlorothiazide, and Coreg.  (Tr. 231, 401).  His blood pressure improved[8] (Tr. 268, 269,402, 612, 614, 621) and his carotid and renal ultrasounds were "unremarkable."  (Tr. 323).  On November 22, 2012 and November 23, 2012, Merlone told Dr. Craig W. Holland that he was feeling much better.  (Tr. 406, 623).  Upon discharge on November 25, 2016, his condition was stable; he denied chest pain, tightness, or palpitations; shortness of breath; dyspnea or orthopnea; headaches, dizziness; vertigo; and lightheadedness. (Tr. 230, 617).  His heart had a regular rate and rhythm, with no murmurs, rubs, or gallops.  (Tr. 231, 233).  He was cooperative, gave good eye contact, and was in no acute distress, "resting comfortably in [his] hospital bed."  (Tr. 231).  He was instructed to take medications such as aspirin, Plavix, Carvedilol, and HCTZ/Spironolactone.  (Tr. 232).

During this first hospitalization, Merlone suffered from hematuria, so Dr. Timothy Burka performed an ultrasound of his kidney and bladder and discovered a mass in his bladder.  (Tr. 347).  Merlone was advised to follow up with an urologist, but he never did.  (*Id.*, Tr. 287, 292, 303, 317).  On January 15, 2013, Merlone went to the emergency room because he was tired, fatigued, dizzy, noticed blood in his urine and passed clots,[9] and was having difficulty voiding. (Tr. 289).  Other than a drop in his hemoglobin level and elevated blood sugars, the "rest of his blood work was unremarkable."  (*Id.*).  He denied having chest pain (Tr. 292, 301, 303), and his

---

[8] After just one day of being in the hospital, Merlone's blood pressure was down to 154/90, and his chest pressure went from being a five or six out of ten to a one out of ten.  (Tr. 323).

[9] An Emergency Room Report says Merlone complained of having dark red blood in his urine on and off for eight months, but it recently became more frequent, with larger amounts of blood and clots.  (Tr. 292).  When he was admitted to the hospital, Merlone reported that he has a "known mass" on his bladder but it has never been evaluated because he had not been able to follow up. (Tr. 292-93).

heart rate and rhythm were regular.  (Tr. 304).  On the same day he was admitted, Dr. Steven Jensen removed the mass from Merlone's bladder.  (Tr. 285).  The mass was noted to be "superficial in nature" and was completely removed "without difficulty."  (*Id.*).  Further, "[n]o residual tumor was noted."  (*Id.*).  Merlone "tolerated [the procedure] without difficulty," leaving the operating room "in good and stable condition."  (*Id.*).  Just two days later, on January 17, 2013, Merlone was discharged in "stable" condition and since he did not have a primary care provider at the time, he was told to follow up with Dr. Jensen in ten days.  (Tr. 289).  An evaluation of Merlone's tumor found it to be "papillary urothelial cell carcinoma, non-invasive, low grade," with "[n]o lymphovascular invasion identified."  (Tr. 291, 312).  At his follow up appointment with Dr. Jensen, Merlone was "doing very well."  (Tr. 311).

Four months later, on April 10, 2013, Merlone went to the hospital because he was experiencing chest pain, shortness of breath, and progressive weakness.  (Tr. 457).  Dr. Rahul Velaga noted Merlone's history of underlying coronary artery disease and diabetes.  (Tr. 653). However, he noted that Merlone's hypertension was "well controlled."[10]  (*Id.*).  Merlone's chest X-ray showed he had "[n]o acute cardiopulmonary disease."  (Tr. 470).  And his cardiac rest and stress scans showed "[n]o definite wall motion abnormalities" with "normal ejection fraction and wall motion" and "[n]o reversible defects to suggest ischemia."  (Tr. 472).  Finally, although the results from Merlone's stress test were "borderline abnormal" (Tr. 475), ultimately, chest pain with acute coronary syndrome was "ruled out."  (Tr. 509).  Merlone's discharge report describes his two-day hospitalization as "[g]rossly uneventful."  (*Id.*).  He left the hospital in "stable condition," with no chest pain and no shortness of breath.  (*Id.*).  His blood pressure was 165/96,

---

[10] When Merlone was in the hospital between April 10, 2013 and April 11, 2013 his blood pressure was:  127/75; 165/96; 149/86; 133/81; 121/71; 138/72; 138/72; 158/75; 144/65; 122/76; 147/75; 153/82; 186/98; 157/96.  (Tr. 482-84).

he was given blood pressure medication, and advised to continue taking his medication for both hypertension and diabetes.  (Tr. 509-10).

On September 20, 2013, Dr. Steven Mattichak performed a "[s]uccessful … stent."  (Tr. 672).  Merlone was discharged "within 24 hours."  (*Id.*).

On January 25, 2014, Merlone was in the hospital for hematuria and had a resection of his bladder tumor.  (Tr. 688).  Noting Dr. Jensen's removal of Merlone's tumor the year before, Dr. Glenn E. Kershen commented:  "I do not think [Merlone] is very compliant with his follow up."  (*Id.*).  Along those lines, Dr. David A. Cook noted that Merlone did not get a nine-month checkup of his bladder cancer due to insurance problems, and his recurrent gross hematuria became quite severe by the time he was admitted to the hospital.  (Tr. 690).  Merlone's hypertension was not an issue:  his blood pressure upon admission was 112/59 and his heart tones were clear, his heart's rhythm was regular, and there were no gallops, rubs, or murmurs. (Tr. 691).  Merlone experienced no complications during this second procedure to remove his bladder tumor.  (Tr. 693).  In fact, he "tolerated the procedure well."  (*Id.*).  Dr. Kershen did not find any evidence of tumor growth when he "cleanly resected off" the mass and concluded that the "remainder of his bladder had no other abnormalities."  (*Id.*).  Like before, Merlone's tumor was found to be noninvasive low-grade papillary urotherial carcinoma.  (Tr. 699).  His doctors opined that systemic chemotherapy was not warranted and that Merlone's treatment could be administered "on an outpatient basis."  (Tr. 712).  While still in the hospital, on January 28, 2014, Merlone also had a catheterization performed by Dr. Mattichak.  (Tr. 697).  A chest X-ray revealed "no acute findings" and showed that Merlone's heart is "normal in size."  (Tr. 700). Other tests showed "no symptomatic congestive heart failure."  (Tr. 705).  Just a few days later, Merlone's discharge condition was stable and his activities were unrestricted.  (Tr. 712).  On

23

February 10, 2014, Dr. Mattichak noted that Merlone, whose blood pressure was 124/84, was "doing well without symptoms of chest pain," and "[c]linically, he is stable."[11]  (Tr. 765).  In addition, in March 2014, Merlone's hematuria had cleared up and "no urinary bladder mass could be identified."  (Tr. 769, 853).  Merlone felt fine and was "without complaint."  (Tr. 853-54).  After a few months, Dr. Kershen still found that Merlone had "no recurrent disease."  (Tr. 855).

On May 20, 2014, Merlone went to the hospital because he felt lightheaded, fatigued, tired, and "off balance."  (Tr. 777).  He denied having chest pain, shortness of breath, and hematuria.  (Tr. 777, 787).  His heart had regular rate and rhythm, with no murmurs, gallops, or rubs.  (Tr. 777).  It was not enlarged.  (Tr. 779).  A CT of his head showed no significant abnormality.  (Tr. 780).  Merlone was hypertensive, but his blood pressure came down and under control on the same day he was admitted.  (Tr. 777).  Three days later, Dr. Mattichak noted that Merlone was having a "difficult time with blood pressure control."  (Tr. 787).  Still, he found that Merlone's symptoms of angina were "controlled with a combination of ranozaline and Imdur," although Merlone "has limited ability to get prescriptions refilled."  (*Id.*).  One month after Merlone was discharged, on June 16, 2014, Dr. Mattichak was "[p]leased to report that [Merlone] has had stabilization of his blood pressure with the addition of clonidine."  (Tr. 869).  He noted that Merlone "has done well, has been stable without recurrent symptoms," and has tolerated his medications (Plavix, aspirin, Effient) well.  (*Id.*).

Thus, while Merlone has clearly faced challenges battling coronary artery disease, hypertension, and bladder cancer since 2012, the ALJ appropriately considered the above evidence, noting that these conditions appear controlled by medications, treatment, and surgery.

---

[11] In March 2014, Dr. Mattichak noticed that Merlone had symptoms of fatigue, nausea, and diarrhea, but concluded that they "do not appear to be cardiac related."  (Tr. 784, 861).

(Tr. 37-39) (noting records indicating that Merlone was "fully independent at home upon release" on November 25, 2012, "doing very well" two weeks after January 2013 bladder cancer surgery, "grossly uneventful" hospitalization in April 2013, "normal" CT tests and chest x-rays in 2013 and 2014). Thus, the ALJ did not at all ignore that Merlone was hospitalized, but rather analyzed the related medical records in detail and concluded that the alleged severity of his conditions was undercut because Merlone's hospitalizations were three to five months apart, for just a few days at a time, and each time he left the hospital, he was in stable condition. (*Id.*). Furthermore, according to the record, Merlone's condition did not require long periods of debilitating treatment (for instance, chemotherapy) or restrictive recovery (for instance, being bedridden or needing physical therapy). In sum, while the ALJ found Merlone's coronary artery disease, hypertension, and bladder cancer to be severe impairments (Tr. 34), his analysis of Merlone's related hospitalizations and treatment is supported by substantial evidence.

As for the ALJ's RFC, the Commissioner argues that Merlone "does not point to any evidence specifying that he will be required to miss work or be off-task for treatment or any other purpose" in the future. (Doc. #25 at 22, 24). The Court agrees. Merlone has not provided evidence that the number of hospitalizations he experienced between 2012 and 2014 is a pattern that is likely to be repeated in the future. Instead, as noted above, the record indicates that Merlone's health improved after the above hospitalizations, and although he will have to continue taking medications and getting regular checkups, the ALJ did not err in failing to find that Merlone would be unable to engage in competitive and ongoing work.[12] The Court thus finds that the ALJ's RFC determination is supported by substantial evidence.[13]

---

[12] The Court also notes that the record contains a physical RFC completed by a "treating physician," Dr. James Wahl, in November 2014 (about three weeks *after* the ALJ issued his decision in this case). (Tr. 896). Dr. Wahl was asked how many hours per month Merlone's

25

3.  *Substantial Evidence Supports the ALJ's Determination as to
Merlone's Credibility Regarding the Severity of his Symptoms*

Merlone argues that the ALJ erred in evaluating his credibility regarding the severity of his symptoms.  (Doc. #20 at 23-25).  The ALJ points to three "inconsistencies [that] suggest that the information provided by Merlone generally may not be entirely reliable."  (Tr. 33, 37, 40).  The first "inconsistency" is that Merlone testified that he returned to work briefly in 2013, but even though he agreed to report a return to work when filing for disability, he failed to disclose this work activity on two occasions after that.  (Tr. 33).  However, the ALJ evenhandedly recognized that "this [inconsistency] may not have been the result of a conscious intention to mislead."  (*Id.*).  He therefore made clear that he was not giving the issue undue weight, one way or the other.  The second "inconsistency" is with respect to the disparity both within Merlone's testimony and self-reports, and as compared to the medical evidence.  For instance, the ALJ noted that while Merlone testified at the hearing that he has "ongoing problems concentrating since he stopped working," prior to that he had reported no problems with concentration and that he could pay attention for a "long time."  (Tr. 37, 64-65, 173).  The ALJ also noted that Merlone's "description of his limitations has been so extreme as to appear implausible."  (Tr. 37).  For instance, when asked what he could do before his illness that he could not do now, he said "function"—but he also reported that he had "no difficulties caring for his personal needs, paying bills, and handling finances."  (*Id.*).  Finally, the third "inconsistency" is that Merlone's statements concerning the intensity, persistence, and limiting effects of his symptoms "are not

limitations would likely disrupt a regular job schedule with low physical demands, and answered "Ø."  (*Id.*).

[13] The Commissioner also argues that when there is no functional capacity evaluation or opinion from medical providers, the state agency medical consultant, in this case, Dr. Nelson, "provides the best evidence of Plaintiff's functional abilities and limitations."  (Doc. #25 at 22) (citation omitted).  The Court has already found that the ALJ did not err in relying on Dr. Nelson's opinion, and therefore, need not address this argument further here.

credible to the extent they are inconsistent with the … residual functional capacity assessment." (Tr. 40).  In making this determination, the ALJ appropriately noted that Merlone's treatment and medications have been effective in controlling his symptoms, and his lack of compliance with taking his medications suggests that his symptoms may not have been as limiting as he alleges.  (*Id.*).

In support of his arguments, Merlone posits that the "medical evidence, rather than being 'weak,' substantially supports the severity of his symptoms and indicates that the ALJ decision did not fully consider the entire medical record."  (*Id.* at 24).  Merlone cites to SSR 88-13 in arguing that symptoms such as pain do not require objective medical evidence because they are subjective and cannot be measured by reliable techniques.  (*Id.*).  The Court disagrees with Merlone's argument.

The Sixth Circuit has held that determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record.  *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or

examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible.  *Soc. Sec. Rul. 96-7*, 1996 WL 374186, *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529.

As noted above, the ALJ found inconsistencies in Merlone's allegations regarding his return to work, and, more significantly, regarding his ability to concentrate and function, and the intensity, persistence, and limiting effects of his symptoms.  (Tr. 33, 37, 40).  Merlone argues that had the ALJ found him to be more credible, he would have given "significantly more weight … to [his] reports regarding the severity of his symptoms, which would have resulted in a finding of disability."  (Doc. #20 at 25).  But Merlone does not point to what reports the ALJ would have (or should have) considered, had this been the case, and evidence of disabling pain does not appear in the record.  Most importantly, although the ALJ pointed out the above inconsistencies, he still carried out a full analysis of Merlone's claim; the ALJ went through all five steps before determining that Merlone was not disabled.  Furthermore, the ALJ's assessment of Merlone's credibility as to the severity of his symptoms is properly based on a comparison between Merlone's statements and the evidence in the record.

The ALJ also properly considered Merlone's activities of daily living as they bear on his credibility.  Merlone says he can't go outside alone because he is "scared of his illness" and what could happen if he were alone.  (Tr. 171).  Similarly, he does not do yard work or house work because he can't do it "without feeling or getting real sick."  (*Id.*).  Ultimately, he says his biggest problem is his inability to "function."  (Tr. 169).  However, although he sleeps throughout the day (Tr. 59) and does very little to care for his daughters (Tr. 55), he has no problems with personal care, managing his finances, or socializing with others.  (Tr. 169, 171, 173).  He can follow instructions and does not use a walking aid.  (Tr. 173-74).  Also, the extent

to which his alleged limitations prevent him from doing his daily activities is unclear.   He doesn't cook or shop—not because of his alleged limitations—but because other people, like his wife, do that for him.  (Tr. 170-71).  And he doesn't help his daughters with their homework— again, not because of his alleged limitations—but because "[t]hey don't really have a lot of homework right now."  (Tr. 169).  Thus, the ALJ did not err in concluding that Merlone's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty," or that "it is difficult to attribute that [alleged] degree of limitation to [his] medical condition as opposed to other reasons, in view of the relatively weak medical evidence…"  (Tr. 39).

Again, the ALJ thoroughly cited Merlone's medical records to support his conclusion that "the evidence does not show that the limitations associated with these conditions are disabling." (Tr. 37).  The ALJ noted that when Merlone was released from the hospital in November 2012, "he was 'fully independent at home'" and "stress testing afterward … showed much improvement."  (Tr. 37, 252).  When Merlone was later hospitalized in April 2013 for chest pain, "his stay was 'grossly uneventful.'"  (Tr. 37).  After Dr. Mattichak performed a repeat catheterization, Merlone "was stable from a cardiovascular standpoint and EKG testing showed sinus bradycardia without acute ischemic changes or infarction and no evidence of heart failure." (*Id.*).  The ALJ noted that months later, Dr. Mattichak reported that Merlone "had 'clinically improved,'" and in June 2014, Merlone "had done well, and had been stable without recurrent symptoms."  (Tr. 38).  CT tests and X-rays performed in 2013 and 2014 showed "normal" results, and "the record repeatedly notes that [Merlone] has no edema and good capillary refill rates."  (*Id.*).  The ALJ also reviewed Merlone's history of hypertension and bladder cancer. Most recently, in June 2014, his blood pressure was 124/70.  (*Id.*).  As for cancer, in March

2014, Merlone "reported that he felt fine, his bladder was unremarkable on exam, and … this condition had cleared up following his surgery." (*Id.*). Two months later, in May 2014, Merlone "continued to report no additional bleeding or hematuria." (*Id.*).

In sum, in assessing Merlone's credibility and the effects of his impairments, the ALJ properly considered the record evidence, including Merlone's statements, his activities of daily living, and the objective medical evidence. The inconsistencies between Merlone's allegations of disability and the objective medical evidence are valid considerations in evaluating his credibility. The Court finds no reason to disturb the ALJ's credibility determination because the ALJ observed Merlone firsthand, and his evaluation of the severity of Merlone's symptoms is supported by substantial evidence in the record.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [25] be GRANTED, Merlone's Motion for Summary Judgment [20] be DENIED, and the ALJ's decision be AFFIRMED.


Dated: August 16, 2016                              s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                            United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and

recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 16, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager